FILED       ENTERED
LOGGED      RECEIVED

Case No. 14 — _____

JUL 2 5 2014

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY _____ DEPUTY

## AFFIDAVIT

1.    I, Special Agent David Gadren, Office of Inspector General, United States Department of Energy, being duly sworn, do hereby state as follows:

2.    I am a Special Agent with the Office of Inspector General ("OIG"), U.S. Department of Energy ("DOE"). I have been employed by the DOE OIG since October 2008 and have been assigned to the National Capital Field Office during this time period. I am currently assigned as a Task Force Officer ("TFO") to the Federal Bureau of Investigation ("FBI") at the FBI's Washington Field Office ("WFO"). During this time period, I have participated in numerous financial fraud-related investigations. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations and to make arrests for offenses enumerated in Section 3056 of Title 18, United States Code. I have received formal training in the investigation of financial crimes, including wire fraud, money laundering, and corrupt practices, at the Federal Law Enforcement Training Center in Glynco, Georgia, and at various other training organizations.

3.    The information set forth in this Affidavit is known to me as a result of investigation personally conducted by me and by other law enforcement agents.

4.    This Affidavit is being submitted for the limited purpose of supporting applications for a criminal complaint and arrest warrant. Thus, I have not set forth each and every fact learned during the course of the investigation. In addition, where conversations or statements are related herein, they are related in substance and in part except where otherwise indicated.

1



5.     This Affidavit is respectfully submitted in support of applications for the issuance of a criminal complaint and arrest warrant for Vadim MIKERIN.

6.     The facts and circumstances set forth in this Affidavit demonstrate that there is a probable cause to believe that MIKERIN conspired with others to commit extortion in violation of 18 U.S.C. § 1951 and money laundering in violation of 18 U.S.C. § 1956.

## BACKGROUND AND RACKETEERING SCHEME

7.     MIKERIN is employed as the general director of TENAM USA ("TENAM"), a Bethesda, Maryland based subsidiary of JSC TECHSNABEXPORT ("TENEX"), which is based in Moscow, Russian Federation.  MIKERIN has been so employed since 2010 and also resides in Bethesda, Maryland.

8.     TENEX is a subsidiary organization of ROSATOM, the Russian State-owned Nuclear Corporation, which is a counterpart organization of DOE in the Russian Federation. DOE and ROSATOM are the respective "executive agents" for an agreement executed in or about 1992 by the United States and the Russian Federation (the "Agreement").  This Agreement concerned the disposition of Russian highly enriched uranium ("HEU") from disassembled nuclear warheads and the sale of that material, once downblended, to U.S. nuclear utility providers.  TENEX was the Russian "commercial agent" responsible for the sale and transportation of this material to the United States.  MIKERIN was integral to the execution and operation of this Agreement.

9.     As director of TENAM, MIKERIN ostensibly manages contracting activities between U.S. based companies and TENEX and facilitates contractual negotiations between the entities.  As such, MIKERIN has direct contact with U.S. persons and companies seeking to do

2



business in Russia with TENEX.  TENAM is thus engaged in interstate and international commerce activities involving the sale of Russian nuclear fuel to U.S. nuclear utility providers.

10.     ████████ was the president of a nuclear materials transportation company, Transport Logistics International ("TLI"), based in Fulton, Maryland, from around 1996 until his death in 2011.  TLI participated in the HEU Agreement by transporting Russian uranium from the Russian Federation to the United States.  Under this arrangement, TLI subcontracted with the United States Enrichment Corporation ("USEC") based in Bethesda, Maryland, which was the United States' principal commercial agent for the HEU Agreement.  ████ worked intimately with MIKERIN and TENEX and also served as president of his own company, ██████████ ██████████████ based in Annapolis, Maryland, where ████ resided until his death in 2011.

11.     Through my investigation I have determined that MIKERIN, ████ and other actors likely located overseas, participated in a scheme to obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion, as those terms are defined in Title 18, United States Code, section 1951, that is, MIKERIN attempted to obtain the property of a U.S. based company seeking to contract with TENEX in the Russian Federation, with that company's consent induced by the wrongful use of force, violence, or fear, including fear of economic loss.

12.     Further, MIKERIN, ████ and others laundered the proceeds of the racketeering scheme through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity (racketeering), in order to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, knowing



that the monetary instrument or funds involved in the transportation, transmission, or transfer

represented the proceeds of some form of unlawful activity and knowing that such transportation,

transmission, or transfer was designed, in whole or in part, to conceal or disguise the nature,

location, source, ownership, or control of the proceeds of specified unlawful activity.

## FACTS SUPPORTING PROBABLE CAUSE

13.     Beginning in 2009, MIKERIN solicited a Confidential Source (CS-1), whom

[redacted] had identified for MIKERIN, to enter into a contract with TENEX.  Under this contract,

CS-1, who was introduced to [redacted] around 2003 by a mutual contact in Florida whom CS-1

understood to be loosely affiliated with Russian and Eurasian organized criminal elements, was

ostensibly to provide TENEX with lobbying and "lobbying and consulting services" and

"assistance and public relations support with the Russian Nuclear Energy Industry," in exchange

for kickbacks.  MIKERIN referred to these transactions as "the system" or "the window" in

communications regarding the transactions.  CS-1 was uncomfortable with the agreement and

approached the FBI with information about the scheme.  Thereafter, FBI and DOJ authorized CS-

1 to participate in the kickback scheme in order to document MIKERIN's illegal activity.  Under

the terms of the first contract in 2009, CS-1 was set to receive $150,000 over three months.

MIKERIN demanded that CS-1 kick back one-third of the contract amount to MIKERIN by

wiring funds to bank accounts under the name "WISER TRADING LIMITED" in the Republic

of Seychelles.  After completing that first contract, MIKERIN again, ostensibly on TENEX's

behalf, contracted with CS-1 in exchange for kickbacks.  Under the second contract, CS-1 was to

receive $550,000 from TENEX over an eleven month period.  This time, however, MIKERIN

demanded that CS-1 kick back roughly half of the contract payments by providing MIKERIN



$50,000 every other month via wire transfer to an account in Cyprus. In 2011, MIKERIN again, ostensibly on TENEX's behalf, contracted with CS-1 for an eleven month extension of the same contract. This time, however, MIKERIN directed CS-1 to deliver the kickbacks in various methods, including providing cash payments directly to MIKERIN, along with wire transfers to offshore accounts.

14.     In 2011, as part of the third contract with CS-1, MIKERIN claimed a wire transfer to WISER TRADING had been lost and directed CS-1 to make wire payments to a new recipient company. This company, LEILA GLOBAL LIMITED, is incorporated in the United Kingdom, but its bank accounts are in Latvia. LEILA's primary director is a Russian national. In coordination with Latvian and U.K. law enforcement authorities, I determined that LEILA is managed by a Cyprus-based, shell holding company connected with two Latvian national directors. Those two single individuals maintain nominee control of thousands of companies registered in various offshore jurisdictions that are used for a variety of purposes, both legal and illegal. Additionally, LEILA has been deemed a shell company by business registration authorities in the United Kingdom, as indicated on information received from that government during the course of this information produced by the United Kingdom Companies House, a public ledger of companies registered in that country.

15.     In addition to the wire transfers made under the third contract, MIKERIN directed CS-1 to pay him a portion of the agreed kickbacks directly in cash. These payments included a $25,000 cash payment by CS-1 to MIKERIN on January 25, 2011; a $25,000 payment on October 28, 2011, and a $50,000 cash payment on January 23, 2012. The cash payments were made by CS-1 directly to MIKERIN, packaged in yellow envelopes per MIKERIN's direction.



On one such occasion, MIKERIN directed CS-1 to divide up a $25,000 cash payment into 5 yellow envelopes containing $5,000 each.  MIKERIN informed CS-1 that these envelopes were to be remitted to TENEX officials coming to the United States.  During one such meeting for the purpose of attempting to renegotiate a contract with MIKERIN, CS-1 confronted MIKERIN about the kickback scheme while wearing an FBI-installed recording device.  MIKERIN admitted at this meeting that these actions were illegal, and referred to the extorted funds as a "business transaction."  Further, MIKERIN told CS-1 that individuals who are responsible for facilitating the "system" of payments are potentially dangerous and might inflict harm on CS-1 if MIKERIN were to report a "problem" with the scheduled payments.  Further, MIKERIN ordered CS-1 not to tell anyone about this scheme, and told CS-1 that he [MIKERIN] would deny having solicited or accepted payments if confronted about it.

16.    The wire transfer payments made from CS-1 to MIKERIN pursuant to the extortion scheme were as follows:

| Date | To | Recipient | Financial Institution | Amount (USD) |
|---|---|---|---|---|
| November 27, 2009 | Alpha Bank Ltd, Cyprus | Wiser | Wachovia | 35,000.00 |
| May 6, 2010 | Alpha Bank Ltd, Cyprus | Wiser | Wachovia | 50,000.00 |
| May 17, 2010 | Alpha Bank Ltd, Cyprus | Wiser | Wachovia | 50,000.00 |
| January 18, 2011 | Eurobank EFG, Cyprus | Wiser | Wachovia | 50,000.00 |
| February 28, 2011 | Eurobank EFG, Cyprus | Wiser | Wachovia | 50,000.00 |
| April 25, 2011 | Eurobank EFG, Cyprus | Wiser | Wachovia | 50,000.00 |
| September 2, 2011 | ABLV Bank, Riga, Latvia | Leila | Wells Fargo | 50,000.00 |
| October 25, 2011 | ABLV Bank, Riga, Latvia | Leila | Wells Fargo | 25,000.00 |

17.    The cash payments made from CS-1 to MIKERIN pursuant to the extortion scheme were as follows:

| Date | Amount (USD) | Location |
|---|---|---|

6



| January 25, 2011 | 25,000.00 | Washington, D.C. |
| October 28, 2011 | 25,000.00 | Washington, D.C. |
| January 23, 2012 | 50,000.00 | Arlington, Virginia |

18.     According to records received from Citibank, MIKERIN made several large cash deposits totaling $3,500 to his personal bank account (to an ATM machine in Washington, DC over a period of seven days) in October 2011, around the same time CS-1 made a large ($25,000) payment to MIKERIN.  Additionally, MIKERIN made several unusually large cash withdrawals from his bank account in January 2012, including $7,800 in a 14-day period, around the same time CS-1 made large payments to MIKERIN.

19.     Subsequent to ████'s death in August 2011, the FBI met with his widow and requested her permission to examine the contents of a safe over which ████ maintained control. The widow consented and, in October 2011, allowed the FBI to examine and photograph the contents of the safe, which she reportedly handed over to MIKERIN shortly afterwards.  Among the contents of the safe were a checkbook belonging to MIKERIN for his Citibank account along with a debit card for this account; bank routing information for LEILA and WISER, documents pertaining to the HEU Agreement; an email to ████ from an email account known to facilitate kickback payments; and two yellow envelopes with "$10,000", and "$5,000" written on them, bearing MIKERIN's initials across the seal.

20.     In addition the safe contained a paper copy of an email message from MIKERIN using an assumed name and the email address schlyapa2009@yandex.ru to ████ at a Gmail address ████████ dated December 15, 2010, in which MIKERIN discusses "IFS



gross commission" for two contracts totaling $244,000, and requesting ▮▮▮ provide information

"in the shortest possible way what are the next steps following IFS agreement with our friends."

This email address (schlyapa2009@yandex.ru) was also utilized during the period of 2009

through 2011 to communicate with CS-1 to direct the wire transfers between CS-1 and LEILA

and WISER.

21.    Further, when MIKERIN was stopped by Customs and Border Protection officers

on November 16, 2013 while he was en route to London and Copenhagen with his wife, he was

carrying a manila envelope containing $5,000 cash.

22.    A review of TENAM records obtained via a search warrant surreptitiously

executed on TENAM's offices in the District of Maryland on February 1, 2014 revealed that

MIKERIN conducted the extortionate activity clandestinely and presumably without the

knowledge of other US-based TENAM employees.  MIKERIN maintained sequestered files in

his personal office under lock and key reflecting transactions between various U.S. based

companies and shell companies, to include LEILA, WISER, and OLLINS DEVELOPMENT

LIMITED ("OLLINS"), located in Switzerland.

23.    A checkbook found at TENAM's facility during this search connected to

TENAM's Citibank business checking account indicated that TENAM paid regular $3,500

payments approximately twice monthly to IFS through 2010 and 2011; on or around June 28,

2011, the ledger reflects a $10,500 payment directly to ▮▮▮ .

24.    Information obtained from the Federal Reserve Bank of New York revealed a

pattern of transactional activity, conducted in the District of Maryland and elsewhere, between

several U.S.-based companies and these three shell companies beginning no later than 2009 and



continuing through the present.  These payments often involved round number transactions with

stated purposes of "consulting services" or "invoice."  These records also reflect CS-1's

"kickback" payments to both LEILA GLOBAL LIMITED and WISER TRADING LIMITED.

25.     In addition, the Federal Reserve records showed that from April 2009 through

February 2011, TLI (presided over by ▮▮▮) transferred $536,854 to WISER; from July 2011

through July 2013, TLI wired $773,546 to LEILA; and from May 2013 through present, TLI

wired $346,447 to OLLINS.  Interviews with DOE and private sector officials intimate with the

processes involved with the HEU Agreement stated that there is no legitimate reason as to why a

company such as TLI subcontracting to USEC under the HEU Agreement would be paying these

amounts to any entities ostensibly controlled by TENEX, be they MIKERIN or others.

26.     In addition to TLI, several of the companies conducting these noted transactions

were directly involved, as was TENEX, with the transmission of enriched uranium from the

Russian Federation to the United States obtained from decommissioned Russian nuclear

warheads, for purchase by U.S. utility companies and use in nuclear power generators in the

United States, conducted under the Agreement, which concluded in 2013.  Your affiant believes

that these activities were conducted during the operations related to the Agreement and may have

affected legitimate commerce operations under the Agreement's purview.  According to the

records provided by the Federal Reserve Bank of New York, one such US-based company

participating in subcontracting activities directly related to the implementation of the HEU

Agreement paid $135,000 to IFS in 2011, just after that company received a multimillion dollar

contract with TENEX to provide goods and services.



## CONCLUSION

28.     Based on the facts set forth above, your Affiant submits respectfully that there is

probable cause to believe that MIKERIN has conspired with others to commit extortion in

violation of 18 U.S.C. § 1951 and money laundering in violation of 18 U.S.C. § 1956.  Your

affiant respectfully requests that a criminal complaint and arrest warrant be issued, as prayed.

FURTHER YOUR AFFIANT SAYETH NOT.

David Gadren
Special Agent
Office of Inspector General
United States Department of Energy

Sworn and subscribed to this 24 day of July, 2014.

William Connelly
Chief United States Magistrate Judge
District of Maryland

10

